IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANDREW LAMON, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 12-CV-1176-NJR-DGW |
| | ) |
| KENNY BROWN, | ) |
| | ) |
|       Defendant. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff, Andrew Lamon, filed this *pro se* lawsuit pursuant to 42 U.S.C. § 1983, for alleged constitutional violations while he was incarcerated at Big Muddy Correctional Center ("Big Muddy"). This matter is currently before the Court on a motion for summary judgment filed by Defendant Kenny Brown on April 11, 2014 (Docs. 55, 56). Lamon filed a response to the motion for summary judgment on May 7, 2014 (Doc. 59). The Court has carefully considered the briefs and all of the evidence submitted by the parties, and for the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

Andrew Lamon is an inmate incarcerated in the Illinois Department of Corrections ("IDOC"). He is serving a thirty-five year sentence for aggravated criminal sexual assault and possession of a controlled substance (Doc. 1, p. 15). He is currently incarcerated at Western Illinois Correctional Center, however, the events giving rise to

this lawsuit occurred while he was incarcerated at Big Muddy.

Defendant Kenny Brown ("Officer Brown") is a correctional officer at Big Muddy. Lamon alleges that after he arrived at Big Muddy, Officer Brown threatened to injure or kill him and prematurely terminated him from his job assignment because of Lamon's participation in a lawsuit against the Illinois Department of Corrections (Docs. 11, 40). After exhausting his administrative remedies, Lamon filed the instant lawsuit against Officer Brown on June 19, 2012 (Doc. 1).[1] He has two claims pending against Officer Brown: a First Amendment retaliation claim and an Eighth Amendment claim for cruel and unusual punishment.

The evidence before the Court includes an affidavit from Lamon ("Affidavit 1") and a number of other documents that were attached to the complaint (Doc. 1, pp. 9–26). Lamon submitted a second affidavit ("Affidavit 2") on January 21, 2014, as part of a Motion for Leave to Expand the Record (Doc. 47, pp. 3–6). Regardless of the label Lamon affixed to the affidavit or the manner in which it was submitted, it appears to the Court that the affidavit was actually a supplemental response to Officer Brown's interrogatories.[2] Lamon also resubmitted Affidavit 2 with his response to the motion for

---

[1] Five other Defendants were named in the original complaint, however, Officer Brown is the only remaining Defendant. Four of the other Defendants—Angela Windsor, Mrs. Ticer, Joe Rupcich, and Unknown Investigator—were dismissed following the Court's threshold review of the complaint pursuant to 28 U.S.C. 1915A (Doc. 11). The fifth Defendant—Lt. Harold Schuler—was granted summary judgment on the issue of exhaustion and dismissed from the case (Doc. 40).

[2] Officer Brown served Lamon with interrogatories on December 16, 2013 (*see* Doc. 59, pp. 19–25). Lamon served his responses on Officer Brown on or about January 14, 2014 (*see* Doc. 59, p. 24). Instead of answering the interrogatories, however, Lamon stated that he would be "furnishing this information in an affidavit, soon" (Doc. 59, pp. 20, 22, 23). Approximately one week later, on January 21, 2014, Lamon submitted the promised affidavit as part of a "Motion for Leave to Expand the Record"(Doc. 47). Lamon sought to put the affidavit on the record in support of his claims (Doc. 47). Magistrate Judge Donald G. Wilkerson denied Lamon's motion,

summary judgment (Doc. 59, pp. 27-30). Finally, the transcript of Lamon's deposition, taken on March 14, 2014, has been also submitted to the Court (Doc. 56-1). Viewing the evidence in a light most favorable to Lamon, the facts of the case are as follows.

Prior to his transfer to Big Muddy, Lamon was housed at Pontiac Correctional Center ("Pontiac"). While he was incarcerated at Pontiac, he drafted a civil rights complaint against the IDOC, which was filed in federal court in the Central District of Illinois, on behalf of another inmate, Jo-Julien Hicks ("the *Hicks* case") (Doc. 1, p. 9).[3] Lamon also appeared as a witness at the *Pavey* hearing where it was determined that Hicks had properly exhausted his administrative remedies prior to filing suit (Doc. 56-1, p. 20). While the *Hicks* case was still pending, Lamon was transferred to Big Muddy.[4]

According to Lamon, he was threatened by Officer Brown from December 2011 through May 2012 because of his participation in the *Hicks* case (Doc. 47, p. 4). During that time, Lamon was housed in the "1-House, C-wing," and he worked as a cell-house porter (Doc. 47, p. 4). Lamon explained that he was essentially a janitor, and his duties included taking out the trash and mopping the floors (Doc. 56-1, p. 18). He worked the 7 a.m. to 3 p.m. shift, and Officer Brown was assigned to that same shift (*Id.*). Lamon stated that he would see Officer Brown on a daily basis each time he took out the trash (Doc. 56-1, p. 13).

Lamon states that Officer Brown began to threaten him in December 2011;

---

and explained that it was unnecessary for him to file an affidavit in support of his claims (Doc. 50). Magistrate Judge Wilkerson further explained that, in the event that Officer Brown filed a motion for summary judgment, Lamon could refile the affidavit in support of his response to that motion.

[3] *Hicks v. Pierce, et al.*, Case No. 10-1021 (C.D. Ill.).
[4] Lamon cannot recall the exact date that he was transferred to Big Muddy (*see* Doc. 56-1, p. 11), and Officer Brown did not provide that information.

however, the first threat that he describes in detail occurred during the first week of January 2012 (Doc. 47, p. 4). According to Lamon, he was returning from taking out the morning trash, and Officer Brown asked if he could speak to him (*Id.*). Officer Brown said that he heard Lamon was "very good at filing lawsuits and testifying," and that while Lamon "had his coward ass in Pontiac," Lamon helped file a lawsuit against the IDOC that was still pending (*Id.*). Officer Brown asked Lamon if he was happy with his job, and Lamon said yes (*Id.*). Officer Brown asked Lamon if anyone held it against him that he was a rapist, and Lamon said no (*Id.*). According to Lamon, Officer Brown then said that "he didn't know what the staff {at Pontiac] was thinking letting a rapist cause trouble for [the IDOC], but [Lamon's] black-ass was in [Big Muddy] now, and he for one wasn't having any of that shit" (Doc. 47, p. 5).

Officer Brown told Lamon that, before the next court date, Lamon had to tell the Illinois Attorney General that he "wanted nothing else to do with that lawsuit or . . . [Brown] was going to fire me from my job, handcuff me for refusing a direct order, and bash my fucking brains out on the floor" (*Id.*). Officer Brown further said to Lamon "if that don't kill [my] smart ass, he'd put me in [segregation] and see to it that my meals contained crushed light bulbs and that he'd come by daily to witness me dying while shitting blood" (*Id.*). When another correctional officer came by, Officer Brown calmed down and told Lamon to "remember our talk and that he'd get back with me in a few days if need be" (*Id.*). Lamon stated that on several subsequent occasions, Officer Brown "reinforced his threats" by telling Lamon to "remember our talk" and to "do the right thing" (*Id.*).

According to the affidavit, Lamon had a "very real fear that the threats would be carried out," which caused him to have nightmares and wake up "in a frantic, sweaty state" (Doc. 47, p. 5). Lamon stated that in April 2012, he spoke with the assistant attorney general assigned to the *Hicks* case, Mr. Joe Rupcich (*Id.* at p. 6). Lamon told Mr. Rupcich that he "wanted nothing more to do with the *Hicks* lawsuit," that he did not want Hicks's attorneys to contact him "because I was no longer helping them" (*Id.*). Other evidence shows that Lamon actually contacted the Illinois Attorney General's office as early as January 12, 2012 (*see* Doc. 1, p. 23). Lamon was told that Mr. Rupcich would contact him at some point in the future to obtain his statement (*id.*), and Mr. Rupcich did so on April 26, 2012 (Doc. 47, p. 6; Doc. 59, p. 53). An investigative report from the Attorney General's Office memorializing the conversation between Lamon and Mr. Rupcich confirms that Lamon stated "he wanted no part" in the *Hicks* case because he had received threats from other inmates and staff at Big Muddy (Doc. 59, p. 53). Lamon further stated that he did not want anyone to contact him at all, and that if he was forced to testify, he would say that he knew nothing about the case (*Id.*).

On May 3, 2012, Officer Brown went to Lamon's cell and said "I heard you had a legal call the other day. You just don't get it, do you?" (Doc. 1, p. 10). Lamon explained that he talked to Mr. Rupcich, but told him that he wanted nothing more to do with the *Hicks* case (Doc. 1, p. 10). Officer Brown responded "we'll see" and said that "if he heard about me talking to anybody else about the lawsuit, [I was] going to find myself in [segregation] trying to digest crushed light bulbs" (*Id.*).

Later that same day, another correctional officer went to Lamon's cell and told

him that Officer Brown had just fired him from his job as a porter (*Id.*). Lamon then received a memo from the Assignment Officer at Big Muddy indicating that he was unassigned from his job effective immediately because his six-month time limit had expired" (*Id.*; Doc. 1, p. 24). According to evidence submitted by Lamon, however, he was assigned to his job on January 20, 2012,[5] and therefore, the six-month limit had not expired (Doc. 1, pp. 10, 25).

Lamon wrote a letter to Joe Rupcich saying that Officer Brown "fired me without cause," and that he feared for his safety (Doc. 59, p. 54). Lamon also wrote a letter to District Judge Harold A. Baker, the presiding judge in the *Hicks* case, and relayed the same information (Doc. 59, p. 55). On May 8, 2012, Lamon was called to the Internal Affairs Office at Big Muddy and asked why he had written a letter to Judge Baker about Officer Brown (Doc. 1, p. 11). A disciplinary report was issued, which placed Lamon under investigative status, and he was put in segregation (*Id.*; Doc. 1, p. 26). According to Lamon, he was released from segregation on May 23, 2012, his security classification was changed from minimum security to medium security without notice or a hearing, and he was transferred to Shawnee Correctional Center (Doc. 1, p. 11). There is no evidence that Officer Brown had anything to do with the disciplinary ticket, the change in Lamon's security classification, or his transfer.

During his deposition, Lamon refused to elaborate or provide any further details

---

[5] It is unclear to the Court when Lamon began his job as a porter. According to Affidavit 1 (Doc. 1, p. 10), and a memo from the assignment officer at Big Muddy (Doc. 1, p. 25), he began his job as a porter on January 20, 2012. But according to Affidavit 2, he was working as a porter as early as December 7, 2011 (Doc. 47, p. 4). The Court also notes that Lamon's assertion that he did not begin working as a porter until January 20, 2012, is in conflict with his statement that he was threatened by Officer Brown during the first week of January 2012 while taking out the trash.

regarding his claims beyond what was contained in the evidence that he had already submitted (*see* Doc. 56-1). In his opinion, by asking him questions that he had already answered in his sworn affidavit (Affidavit 2), defense counsel was refusing to acknowledge the existence of that affidavit (*see* Doc. 56-1). Because of his frustration, Lamon claimed that he could not remember the answers to any of defense counsel's questions.[6] For example, he testified that he could not recall when he was first threatened; he could not recall if he was threatened more than once; he could not recall any statements made by Officer Brown; and he could not recall how he knew the threats were made as a result of his participation in the *Hicks* case (*Id.* at 21–22). Lamon reiterated to defense counsel that the evidence he was relying on to support his allegations was limited to his affidavit and the documents attached to his complaint (*Id.* at 25–26). Defense counsel did not file any motions or seek any type of relief from the Court related to Lamon's lack of cooperation at the deposition.

## DISCUSSION

### A. Legal Standard for Summary Judgment

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party. Because the

---

[6] Lamon states in his response to the motion for summary judgment that after "gleaning that the Defendant [sic] goal was to denigrate his affidavit by badgering him, [he] simply shut down and 'subsequently' stated he didn't recall because the Defendant's clearly demonstrated that they [illegible] not honoring his affidavit" (Doc. 59, p. 7).

> primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial . . . . A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations omitted). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

**B.  The First Amendment Retaliation Claim**

The crux of Lamon's First Amendment claim is that Officer Brown retaliated him against him for being a jailhouse lawyer by threatening to hurt him, to place him in segregation, and to fire him from his job. To prevail on this claim, Lamon must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered an adverse action that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in Officer Brown's decision to take the adverse action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citations omitted).

In his motion for summary judgment, Officer Brown takes issue with Lamon's ability to establish element two — that he suffered an adverse action likely to deter future First Amendment activity (*see* Doc. 56, p. 6). Officer Brown points out that Lamon testified that he could not recall the threatening statements, how often they occurred, or

how they related to his participation in the *Hicks* case (*Id.*). He reasons that if there is no evidence as to what the threats were, then there is no dispute that these threats were insufficient to rise to the level of actionable retaliation and to deter an inmate from exercising his constitutional rights (*Id.*). Officer Brown also points out that Lamon was not actually deterred from exercising his First Amendment right to speech when he "continued to exercise his constitutional rights by submitting letters to the court and the Illinois Attorney General's office" (Doc. 56, p. 7).

The Court must first address the issue of what evidence is properly before it. In arguing for summary judgment, Officer Brown relies strictly on Lamon's deposition testimony. The deposition testimony is not the only evidence that has been submitted, however. Lamon submitted two affidavits and a number of other documents that provide details regarding the content, nature, and frequency of Officer Brown's threats, and also show that Lamon was fired from his job as a porter. (Doc. 1, pp. 9–11, 23–26; Doc. 47, pp. 3–7; Doc. 59, pp. 19–57). Officer Brown does not acknowledge the existence of any of that evidence until over halfway through his brief, when he makes a very cursory argument that the Court should disregard Affidavit 2 (Doc. 56, p. 6). Officer Brown states that "to the extent Plaintiff attempts to rely solely on an affidavit outlining the alleged events concerning Defendant Brown, Defendant would ask that the court strike the affidavit" (Doc. 56, p. 6). He then cites to an unpublished case from the Northern District of Illinois and includes an explanatory parenthetical suggesting that the affidavit should be stricken because it is contradictory to "lack of recall" answers at a deposition (*Id.*).

Officer Brown is correct that a plaintiff "cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition." *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 532 (7th Cir. 1999); *accord Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.*, 259 F.3d 792, 799 (7th Cir. 2001) ("[P]arties may not patch-up potentially damaging deposition testimony with a contradictory affidavit.") (internal quotation marks and citation omitted). In circumstances where a conflict exists between a plaintiff's sworn deposition testimony and a later filed affidavit, "the deposition testimony overrides statements made in the affidavit." *Piscione*, 171 F.3d at 532.

That proposition of law, however, is not applicable here. Lamon originally submitted Affidavit 2 months before his deposition as a supplemental response to Officer Brown's interrogatories. Furthermore, Lamon also referenced Affidavit 2 a number of times during his deposition and told defense counsel that the answers to her questions could be found in the affidavit. Therefore, it cannot be said that Lamon submitted the affidavit after his deposition for the purpose of undoing or contradicting his testimony in order to defeat summary judgment. Consequently, Officer Brown has not given the Court any legitimate reason to exclude Affidavit 2, and it is properly before the Court for consideration.

The Court now turns to the question of whether the evidence before it is sufficient to establish that the alleged retaliation was the sort that would "deter a person of ordinary firmness" from exercising his or her First Amendment rights. *Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009). Lamon claims that he engaged in First Amendment

activity by assisting Jo-Julien Hicks in filing a lawsuit and exercising his right of access to the courts. And there is evidence that because of that activity, Officer Brown threatened Lamon and had him fired from his job. There is also evidence showing that after Officer Brown threatened Lamon, Lamon contacted the Illinois General's Office, said he did not want anything to do with the *Hicks* lawsuit, and asked that no one contact him again. Viewing this evidence in a light most favorable to Lamon, it is more than sufficient for a reasonable jury to find that Officer Brown's actions would deter a person of ordinary firmness from First Amendment activity.

Furthermore, contrary to Officer Brown's assertion, the fact that Lamon sent letters to the Illinois Attorney General's office and a judge does not compel a different conclusion. Lamon was not acting as a jailhouse lawyer when he sent those letters. Instead, he was letting someone know that Officer Brown had made good on one threat and begging for protection. Lamon was not engaging in the protected activity that he was allegedly deterred from performing, and therefore this evidence does not undermine his claim. And it certainly cannot establish that, as a matter of law, Officer Brown's actions would not deter a person of ordinary firmness from First Amendment activity.

Accordingly, Officer Brown's motion for summary judgment as to the First Amendment retaliation claim is denied.

## C.  The Eighth Amendment Claim

Lamon claims that Officer Brown's threats constituted cruel and unusual punishment in violation of the Eighth Amendment. In the prison context, the Eighth Amendment prohibition against cruel and unusual punishment forbids the "unnecessary and wanton infliction of pain" by prison authorities. *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (citations omitted). This includes physical injuries as well as psychological pain. *Id.* Consequently, a threat can rise to the level of an Eighth Amendment violation. *Dobbey v. Ill. Dep't of Corr.*, 574 F.3d 443, 446 (7th Cir. 2009), "Mental torture is not an oxymoron, and has been held or assumed in a number of prisoner cases to be actionable as cruel and unusual punishment." *Id.* (quoting *Thomas v. Farley*, 31 F.3d 557, 559 (7th Cir. 1994)).

That being said, "[s]tanding alone, simple verbal harassment does not constitute cruel and unusual punishment." *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). Harassment can become cruel and unusual punishment only when it involves "a credible threat to kill, or to inflict other physical injury." *Dobbey*, 574 F.3d at 446. In determining whether a prison official's words or actions can be taken seriously as a threat, rather than mere harassment, courts must apply an objective standard. *Id.* The pertinent inquiry is whether a "reasonable" victim would fear for his life as a result of the threat; not whether this plaintiff experienced actual fear. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

This inquiry is not simple because "[t]he line between 'mere' harassment and 'cruel and unusual punishment' is fuzzy." *Dobbey*, 574 F.3d at 446. The case law cited by

the Seventh Circuit suggests that a threat is credible, and therefore falls on the cruel and unusual side of the line, when it is accompanied by something, such as the presence of a weapon or other sign of force, from which one could reasonably infer that the inmate "suffered the terror of instant and unexpected death or serious injury." *Northington v. Jackson,* 973 F.2d 1518, 1524 (10th Cir. 1992); *Dobbey,* 574 F.3d at 446.

For example, in *Burton v. Livingston*, the conduct was on the cruel and unusual side of the line where a prisoner alleged that a guard pointed a gun at him, cocked it, called him "nigger," and repeatedly threatened to shoot him. 791 F.2d 97, 100-01 (8th Cir. 1986). *See also Northington,* 973 F.2d at 1524 (holding inmate stated an Eighth Amendment claim when he alleged correctional officers surprised him, placed a revolver to his head, and threatened to kill him). That was also the case in *Irving v. Dormire,* where a prisoner alleged that a guard had threatened to kill him, repeatedly offered a bounty to any prisoner who would assault him, and gave a prisoner a razor blade with which to assault him. 519 F.3d 441, 449-50 (8th Cir. 2008).

Conversely, the conduct in *Dobbey v. Ill. Dept. of Corrections*, could not be taken seriously as a threat and fell on the harassment side of the line. 574 F.3d at 446. In that case, a guard stood up from playing a card game with other officers and hung a noose, which was visible to the plaintiff and other inmates, swatted the noose to make it swing, and sat down "looking crazy with evil eyes." *Id.* at 445–46. The Court held that "getting up in the middle of a card game to hang a noose in the sight of black prisoners, while the other players calmly continue the game, cannot reasonably be taken seriously as a threat, rather than as racial harassment" and this conduct "fell well short" of that in *Burton* and

*Irving. Id.* at 445, 446. Similarly, in *Gavin v. Ammons*, the inmate failed to state a claim for cruel and unusual punishment where he alleged that a guard called him names, said that one day the inmate's head would be brought in on a silver platter, and that one day he "would be in a position to kill" the inmate. 21 F.3d 430, at *2 (7th Cir. 1994). The guard's comments did not fall on the cruel and unusual side of the line because the inmate "[did] not allege the presence of a drawn weapon or other sign of force from which one could reasonably infer that he suffered 'the terror of instant and unexpected death' or serious injury." *Id.* (citing *Northington*, 973 F.2d at 1524).

Here, Lamon has failed to put forth any evidence showing that Officer Brown's conduct was egregious enough to constitute cruel and unusual punishment. Instead, the evidence shows that Officer Brown made verbal threats of potential future harm that were unaccompanied by any other indicia of violence. Therefore, no reasonable jury could conclude that these comments were true threats rather than mere harassment. Accordingly, Officer Brown is entitled to summary judgment on Lamon's Eighth Amendment claim.

### D. Qualified Immunity

Officer Brown also argues that summary judgment is appropriate because he is entitled to qualified immunity as to both the First Amendment claim and Eighth Amendment claim (Doc. 56, pp. 8–10). The Court disagrees.

"Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634

F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). In determining whether Officer Brown is entitled to qualified immunity, the Court must ask two questions: (1) whether the facts, taken in the light most favorable to Lamon, show that Officer Brown violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Hernandez*, 634 F.3d at 914 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 202 (2001)).

The Court has already concluded that the evidence, when viewed in a light most favorable to Lamon, does not establish a genuine issue of fact as to whether Officer Brown violated Lamon's Eighth Amendment rights. Therefore, the Court need not consider the issue of qualified immunity as it relates to the Eighth Amendment claim for cruel and unusual punishment. The Court must only evaluate whether Officer Brown is entitled to qualified immunity as to the First Amendment retaliation claim. The Court has already determined, as set forth above, that Lamon has demonstrated that a genuine issue of fact exists as to whether Officer Brown retaliated against him for participating in the *Hicks* lawsuit in violation of his First Amendment rights. Thus, the issue is whether Lamon's rights were clearly established at the time of the alleged violation.

A right is clearly established when "the contours of the right [are] sufficiently clear" that every "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). When Officer Brown threatened Lamon, it had been established for nearly twenty years that retaliation against an inmate for filing lawsuits or for helping other inmates in filing lawsuits violates the inmate's First Amendment right to free speech. *See, e.g., Babcock v. White*, 102

F.3d 267, 275 (7th Cir. 1996); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996); *Schilling v. Sweney*, 182 F.3d 922 (7th Cir. 1999). Therefore, Lamon's rights were clearly established at the time Officer Brown allegedly retaliated against him. If the jury believes Lamon's version of the evidence, then Officer Brown is not entitled to qualified immunity. As such, Officer Brown is not entitled to summary judgment on the qualified immunity defense.

## CONCLUSION

For the reasons set above, the motion for summary judgment filed by Defendant Kenny Brown (Doc. 55) is **GRANTED in part and DENIED in part**. Plaintiff Andrew Lamon's Eighth Amendment claim is **DISMISSED with prejudice**. This case will proceed only on Lamon's First Amendment retaliation claim. A final pretrial conference and trial date will be set by separate order.

IT IS SO ORDERED.

DATED:   December 23, 2014

s/ Nancy J. Rosenstengel
**NANCY J. ROSENSTENGEL**
**United States District Judge**
